Thank you, Your Honors. May it please the Court, my name is Michael Mallow and I am representing the appellant's defendants in the case who, with the Court's permission, I'd like to refer to collectively as Q-Checks. Your Honor, the overriding issue that is presented in this case is whether Q-Checks can be held liable under Section 5 of the FTC Act for the actions of unidentified, unaffiliated, independent third parties that are accused to have caused consumer injury. In this case, the Q-Check software, which is the product and service at issue in the case, is a passive software product. It is a neutral product. In finding that Q-Checks was liable under Section 5 of the FTC Act, the lower court erred because the lower court dispensed with all prior Federal Trade Commission cases related to causation as it relates to an unfair act. And B, disregarded both persuasive state cases that looked at the issue of causation and disregarded an analogous issue in the Communications Decency Act, which I know the Court is familiar with, in terms of what constitutes an affirmative act that will cause a consumer injury. Let me ask, do you need an affirmative act? I mean, what I'm concerned about is the blind eye situation where there's evidence in the record that, I don't know, that 60-some percent of the 18,000 calls were reporting fraud in this whole check scheme. So under your theory, your client can just say, hmm, that's interesting that there's this rampant fraud going on through the use of our check software. Isn't that sufficient, not under aiding and abetting, but under new or should have known and having the liability for the causation? Well, let's, let me answer it this way, Your Honor. First, we need to look at what the standard is for an unfair act under Section 5N of the FTC Act. And the first element is, does the product or service cause the consumer injury? Okay. So when we're looking at cause, we have to deal with what is it that Q-Tex has done and does that actually cause the injury? So what Q-Tex has done is provide a software product that sits on the Internet and it's utilized by consumers. So under your theory, could I establish a company tomorrow called getawaycar.com and say, you know, why bother stealing cars to rob banks or carjacking cars? We'll park a car with keys in it in front of your favorite bank. And if you want to go inside and rob the bank, that's fine. We have nothing to do with that. All we do is park the car in front of the bank with cars and with the keys and the ignition. And that's okay. Let me address it this way, Your Honor. If you if you know, if you know, I don't know. I don't know. I just do it. This is a service. No one else is providing it. It sounds good. It's a catchy name. And I'm going to park a brand new Lincoln town cars in front of banks with keys and ignition in case somebody might want to use that car. And as soon as this is unrelated to the rental car cases that we had, the answer to say they didn't pay the assessment. The answer is, Your Honor, you'd be looking at what the activity is. OK, what's the activity? I'm parking a car in front of a bank. I'm promoting the use of that vehicle to violate the law. I'm promoting it and I'm facilitating not passively facilitating it. I am actively facilitating the violation of law by by putting the car there with the keys, with the intention that the car be used to commit a bank robbery. No, that would be a problem. Absolutely. That's not the facts of this case as alleged. And as and the evidence brought to the district court by the FTC. That's not this case. So all your clients did was provided a check service and electronic Internet check service that anybody could jump in and and and use and divert the money from the legitimate account. Right. Not exactly. Your Honor. Tell me how that description you're on. OK. Number one, you have it is a soft. It is a software conduit, much like the conduits that have been found by the court not to destroy immunity under the under the CDA. It is a passive, passive. But this isn't the CDA. This is not the CDA cases are instructive. Your Honor, I don't think so. I don't think that criminal any criminal violations are those which distinguish. So we have the software. And here's the evidence that was presented to the court below. The software program was provided. Consumers are in control of the program. The program had sort of. They're sort of in control. Well, they are in control. Any outsider who has access to the information can come in and abuse it. Right. Well, according to the FTC, those are still consumers. They're malintended consumers, but they are still consumers, according to the Federal Trade Commission. So you have QTEX and the evidence below was that QTEX did, in fact, take affirmative steps to try to curtail the use of the software in a fraudulent manner. There is the evidence was that they froze accounts if they call believe that there was a problem with the account. So how do you deal, for example, with the duty to be specific to Bobowski affidavit? Mr. Bobowski says, look, I work for this company. All of a sudden, checks started showing up on our accounts that we didn't authorize. I called your clients and they said, well, you know, we're looking into it. We don't know. And we had no account with your clients. Then they moved. They shut down their banking operation. They opened an account and more checks, fraudulent checks. And your folks say, well, no, we can't. We can't close those accounts down because we don't know. Only the person. Only the fraud. The person is committing the fraud and shut down those accounts. So why isn't that a little more than just being a passive conduit for fraudulent activity? Well, you know, this is the same problem that's being experienced by any type of provider of financial financial conduit. The payment processors have this issue being the credit card. Issues have this issue. The blank check providers have this issue. There isn't. Look, there is an issue of identity theft and fraud. The check scam that is identified in the affidavits is not a key checks check scam from offshore. It is a check scam that exists after a bank, which there's a lot of money laundering going on in major banks, money laundering going on, for example, in car dealers. But in the bank, they have a whole software system. And all of this is electronic now. So the only difference is most of them also have a building, but they basically have an electronic software system. And there's no doubt in my mind that a bank would be liable if we had this situation. What distinguishes you from the bank? The bank is liable under uniform commercial code, which the FTC says is not applicable in this case. But the bank might also be liable from the consumer. Correct. The bank's liability flows from the uniform commercial code. I am not aware that banks have been sued other than for negligently handling, specifically handling a check in a negligent way. So once it comes to light with your client that there's so much fraud going on and you have so many investigations and you have so many inquiries related to fraud under your theory, because it's passive and there's no causation and no Section 5 violation, is that right? Correct, Your Honor. There is no Section 5 violation. So in other words, any kind of software that one puts on the Internet, makes available through the Internet, as long as it's simply passive software, the fact that it might facilitate fraud is irrelevant. Well, the Internet itself facilitates fraud, Your Honor. It is a conduit of fraud. Yeah, but the Internet is not a thing that you can bring into the court. You bring into court individuals or companies that operate. The Internet is simply a medium for transmission. But you now, so I'm not, you have put your product on the Internet. Should we be hauling in Microsoft because they have an Internet Explorer that is a specific product that facilitates the ability of people to commit fraud on the Internet? Should we be hauling in Netscape? No, but Microsoft doesn't advertise the security of the accounts. Your accounts are secure. We're going to protect your checking account. We're going to do this. You made some representations here. Now, that's a different situation. We're using specific software that somebody signs up for, making representations than having generic software out there. Your Honor, I am so glad that you raised that point. This is not a deception case. The FTC specifically did not bring that case. I'm talking about how you distinguish the software. You're trying to make this a generic software case, but your software was specifically designed to do something. And I take your point that they didn't pursue that issue on advertisement. But the fact is you did hold yourself out as having secure software. So it's not just that was your product. You wanted people to use your product because you wanted to tell them it was safe and they could use their checks, right? The product facilitated a different way of being able to affect commerce that at the time was fairly unique. It is no longer unique at this point in time. But the point you are once you're at one. Go ahead. I'm sorry. The point you have made on your honor, I think, is an extremely critical point, which is this is not a deception case. This is not a matter of Q techs turning around to consumers and advertising a level of safety or communicating a level of safety. That's not this case. So that's an important distinction because I take your point. But let's assume all you say is true. But once you had knowledge that there was there are hundreds of thousands of fraudulent transactions going through the software, didn't that change it? Aren't we into the situation? Judge McKeon talked about the willful blindness, if you will. As a matter of fact, we are not for two reasons. Number one, section five and does not have language in there that suggests that not mere knowledge is sufficient. Number two, take a look at the FTC cases that predate this case. The long line of cases that the FTC talks about stemming from 1920. Every one of those cases, every one of them, the defendant had an active role in the fraud and active, not passive, not merely knowledgeable, an active role in what was going on. Could you help me out then on the case involving the FTC and windward marketing? And there was the bank. Basically, there was a bank in that case or something equivalent wholesale, correct? Correct. And so in that case, the district court didn't appear to require actual knowledge. The bank had these bank accounts and they were being used for illicit purposes. Now, the bank wasn't doing anything necessarily illicit, but its accounts were being used. Why wouldn't the Kitchex be in a comparable position? Two reasons. Number one, the bank knew full well who was engaged in the improper activity. Number two, the bank was, in fact, actively involved in that activity. It was making the deposits knowing those deposits and the accounts were false. And number three, the bank and the evidence established the bank benefited as a result of those transactions. Here, the Kitchex doesn't know, doesn't control the third parties who were committing the bad acts. I take your I agree with your point of distinction, but I'm not sure that's what the court relied on in that case. Why? Show me where you think. Why do you think it's pivotal in that case as opposed to descriptive? I think it's pivotal because it makes the distinction between the active participation in in in violative behavior and requiring a defendant to actually take steps to prevent Section five violations, which is exactly what the SEC, the FTC is seeking to have Kitchex do in this case. Again, having knowledge that fraud is occurring, but having no control over it in terms of controlling the third parties who are committing the fraud is different than having requiring a defendant to actively take steps to prevent fraud and or to stop fraud. That's the FTC's job to a great extent. And no, you know, Kitchex did not turn a blind eye. It did make efforts. They weren't good enough, according to the FTC. Apparently they weren't good enough for the district court. That's a factual determination. The district court shouldn't have made. But it's not what Section five provides. There is no obligation to prevent fraud. You know, as I noticed that I have one minute left and I would like to reserve that time. All right. Lawrence DeNil Wagman for the Federal Trade Commission. May it please the court. The Kitchex system clearly satisfies all three elements of an unfair practice under the FTC Act. The system, this check creation and delivery system, caused substantial injury to consumers. Consumers could not reasonably avoid that injury. And the system did not provide costs and benefits, did not have any costs and benefits to consumers or competition that were sufficient to overcome the harm that the system caused. That's why the district court held that the system was an unfair practice under the FTC Act and joined it and required Kitchex to disgorge the proceeds that it received as a result of operating the system. Now, Kitchex spends a lot of time arguing about the issue of causation. And, in fact, the Kitchex system clearly causes substantial injury. This is consistent with a line of cases going back to 1922. The first case is FTC versus Winstead-Hosry. That's a particularly important case. That was a decision by Justice Brandeis, Supreme Court case by Justice Brandeis, who was a drafter of the Federal Trade Commission Act. That case is at 258 U.S. 483. At page 494, Justice Brandeis says that a person who provides someone else with the means to consummate a fraud is himself a violator of the FTC Act. Subsequent cases, FTC versus Keppel, another Supreme Court case, FTC versus Regina, FTC versus McGee, a case decided by the Central District here and then affirmed by the Ninth Circuit, and most recently, FTC versus AccuSearch. Now, at page 6 of their reply brief, they argue that in all those cases, the creator of the mechanism or device that was used by someone else to deceive consumers, they argue that the creator of that mechanism or device cooperated with a third party to injure consumers. But the McGee case is a good example of why that's not so. In McGee, years after the death of artist Salvador Dali, the McGee Publishing Company printed images that had been created by Dali on sheets of paper that years earlier during his lifetime had been autographed in blank by Dali. Now, McGee did not care whether the art dealers to whom it sold these prints retailed them deceptively to consumers as original works of art by Dali. Nonetheless, the court held that McGee was a violator of the FTC Act. So too here. Q-Chex clearly does not care whether the checks that it creates and delivers are fraudulent. But because that is... Well, isn't that a matter of proof? When you say they don't care, your opponent will say, well, no, we took all these steps to prevent the fraud. Some of them weren't successful, but that's an evidentiary question. What's wrong with that? No, Your Honor. The steps that they took were all a matter of closing the barn door after the horse was already gone. In those cases, yes, there were situations where they would get calls from consumers saying that checks had been written on their accounts. But they made an affirmative decision not to put fraud protection on their system. They tried several times. They found they were losing business. Why were they losing business? Because crooks were using their system. And once they put fraud protection on the system, the crooks stopped using the system. It's not a question of fact. There's no disputes as to what they did. There are no factual disputes as to what they did. And the court properly evaluated the unquestioned, undisputed evidence here and determined that the system, as they set it up, the predictable and natural outcome of setting up a check creation and delivery system without fraud protection was that crooks would use it. The question I have then brings to mind something like eBay where there's always allegations of fraud going on in terms of illegal artwork, all kinds of things that are sold that might be, you know, imposter or imitative goods. Are you saying that so long as someone like eBay has fraud protection in place, then it would immunize them from liability and that's all they needed to do? I'm saying that were we to analyze whether eBay or Xerox or Microsoft or anybody else had committed an unfair practice under the FTC Act, we would have to look at all the elements of unfairness under Section 5N of the FTC Act, 15 U.S.C. Section 45N. We would have, for example, it is presumably predictable that someone with a Xerox machine could violate copyright, could try and counterfeit, whatever. But the commission has to analyze that under all parts of the test. Does Xerox system or do the costs and the benefits of Xerox systems outweigh the potential harm from the system? The benefits of Xerox and Xerox machines dwarf the risks of copyright violation or other fraud. Same with respect to eBay to the extent that eBay were found to cause- In a case such as this one, in a summary judgment case, and this Court can look at the evidence, there were no genuine issues of fact with respect to the cost and benefit analysis. Here, the commission presented- These are value questions to a certain extent, opinions. I mean, you're weighing costs and benefits. It's not in this sort of context. It's not-one can't compute it with mathematical precision. No, Your Honor. I mean, you say, for example, you say, well, copiers obviously-value copiers obviously outweigh- Right. Well, we take that at face value. But we say that without doing any mathematical analysis of whether it's not. Right. So the question is, why isn't that for a jury? Because, Your Honor, the question is not whether there may be some factual questions here. It's whether there's a genuine issue of fact that was before the Court in the context of summary judgment. They had an opportunity to present facts. We had an opportunity to present facts. The judge considered our presentation, which rested in part upon the expert declaration of Professor Mann. That's a page- Then I feel like the Court is kind of weighing facts. So, for example, here, we're kind of in an era, in this case, before all the big banks and everybody else was operating and offering these electronic check and electronic banking with very, very carefully controlled fraud implementation. We're kind of in an era where they're coming into the consumer market offering something that hadn't been marketed before. So now you have to look at it in the context of when they came to the market and what they offered consumers. Because before, there was no way to use the Internet to write your check. You just had to write it and put it in the mail. They gave you the opportunity to change all that. So why isn't that a consumer benefit? Your Honor, they came on the market at the same time that banks began to provide the same service, that PayPal provided a service that facilitates transactions. It's important to look at the expert declaration of Professor Mann. He explained that what distinguished and what continues to distinguish and will continue to distinguish the Q-Check system if the district court's decision is not affirmed, is that it does not provide fraud protection. Legitimate consumers have plenty of other options on the market available to them with fraud protection. The only evidence that Q-Checks presented, which it contains, precludes entry of summary judgment, is the declaration of James Danforth. James Danforth is a defendant in this case. He's a manager and officer of one of the corporate defendants. In his declaration, he trumpets the benefits of electronic checking, but he leaves out a crucial fact. Q-Checks did not just offer an electronic check creation and delivery system. What it offered, what made it distinctive, was that it offered an electronic check creation and delivery system without fraud protection. That's why it was, as the district court said, a dinner bell for fraud. A declaration that leaves out the salient fact of this case cannot create a genuine issue of fact, which would preclude entry of summary judgment. On summary judgment, both sides may present facts. That is not predicated on a representation about it being a fraud proof or a fraud related, but rather you're linking the fraud or the absence of fraud information here to the cost benefit? Yes. Professor Mann's declaration explains that the Q-Check system is a benefit only to crooks because it's the system out there without fraud protection. Legitimate consumers have many other systems available to them so that they can make electronic check or payments. The distinctive factor about this particular program is that it lacks fraud protection. So if a computer manufacturer sells a computer without even temporary virus protection software, does that violate the statute? Again, I think it would depend. Your argument would be, well, on one hand, everybody's in the market. Everybody provides virus protection. This is one of the few companies that sells a computer without virus protection. Is that what you're saying? I don't know why anyone would buy a computer without virus protection. I think perhaps the better example is the getaway rent-a-car business. And maybe not only do they leave the cars parked in front of the banks, but just by chance they'll remove or obscure the vehicle identification numbers on those cars. That's somewhat of a similar situation. We're going to scale here. The cases in which liability has been found generally involve more affirmative acts than this case does. Wouldn't you agree? No, Your Honor, I would not agree. In the McGee case, there's an affirmative act here. There's an affirmative act in McGee. There's an affirmative act in McGee. There's an affirmative act here. They create and deliver checks. They print out those checks. They make those checks look good. They make them look far better than you could make them on your home computer. That's another reason this is particularly appealing to a crook. They make the check look professional. They mail it from a U.S. address, which is... Did they ever claim they had fraud protection? No, they never claimed that they had... Well, they never claimed that they had fraud protection. They did claim, however, that they would provide you with security because if you signed up your checking account on the Q-Check system, then they would only sign up your checking account once. You would be safe. No crook could use Q-Check's checks to access your checking account. That's the only... They never... That was the fraud protection that they touted. They never advertised fraud protection. They wouldn't have. They were trying to appeal to crooks. This is not a deceptive advertising case. This is an unfairness case where we allege, and the district court correctly held, that they have provided a system that causes substantial injury to consumers. The injury, as you noted in the Babowski Declaration, who spent a great deal of effort to get his account corrected. The injury was substantial. Consumers, like Babowski, whose account was wrongfully accessed, took time, effort, and sometimes money, and multiplied by the 150,000 checks that they created and delivered, that injury was substantial. And consumers could not avoid that injury. Now, Q-Checks speaks in their brief about identity theft. It says these consumers were victims of identity theft. But what they're pretending not to recognize is that it's very easy, without identity theft, to get access to a checking account number. If I return an item to a store, and the store mails me a refund check, and I can look at the face of that check, I have the store's checking account number. Q-Checks would now create and deliver checks for me on the store's checking account. And, in fact, the Best Buy store chain was a major victim of Q-Checks. We found out about this case because there were four checks written on the Federal Trade Commission's. Yes, I think that's probably what that is. That is what first alerted us to this case. I think the Federal Communications Commission was also hit. And if they are permitted to resume operation of this system, as they contend they should be allowed to do, then none of us, none of us has a checking account that's safe. Because there is no way, given the way the checking system operates, there is no way to secure, to protect checking account numbers. Checking account numbers have to be on the face of the check for the check to process through the system. And there were no offsetting benefits. They simply did not create an issue with respect to that because Mr. Danforth's declaration was not sufficient. It ignored the crucial fact of this case that this is a system without fraud protection. Thank you. You have about a minute. Thank you, Your Honor. There's a point that counsel argued to this Court that I'm hoping the Court pays very, very close attention to, which is that Q-Checks appealed to crooks, to the criminal element trying to scam consumers. Please remember that and look at the record. Because what the Court will see is there was no financial benefit established, there was no financial benefit derived by Q-Checks as a result of the fraudulent activity. Why in the world would Q-Checks want to appeal to an element for which it derived no financial benefit? It makes no sense. That's the FTC's case. It makes no sense. The FTC and the Court cannot argue that Q-Checks did not or turned a blind eye to fraudsters. What they're arguing is we don't think they did enough. We don't think their attempts were good enough. We wanted them to do more. That's not the standard under Section 5N of the FTC Act. Thank you. Thank you, Your Honor. The case just argued, the Federal Trade Commission v. Niobe is submitted.
judges: Hawkins, Thomas, McKeown